**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
JERI WASCO,                         :
                                    :
        Plaintiff,                  :
                                    :
    v.                              :  Civil Action No. 04-0099 (JR)
                                    :
T CORPORATION d/b/a                 :
TIMBERLAKE'S,                       :
                                    :
        Defendant.                  :
```

**MEMORANDUM**

The facts of this Americans with Disabilities Act (ADA) case are set forth below:

1. In the fall of 2002, Jeri Wasco visited Timberlake's Restaurant, hoping to dine there with some friends. Ms. Wasco was born with cerebral palsy and uses a motorized scooter. When her friends discovered that Timberlake's was not accessible by wheelchair or scooter, they decided to dine elsewhere.

2. Six months later, James Watson was retained by the law firm of Schwartz Zweben and Associates, LLP., which had been retained by Ms. Wasco, to verify that there were architectural barriers to entry at Timberlake's. Mr. Watson confirmed that the front door was not accessible.

3. Six months after that, in December 2003, Ms. Wasco filed a complaint against William Timberlake, alleging violations of the ADA. In addition to complaining about the front door,

Ms. Wasco's complaint averred that "there are other current violations of the ADA at the RESTAURANT . . . which are not specifically identified herein."

4. Timberlake's is housed in an old building and was established well before the ADA was enacted. It is therefore required to accommodate patrons with disabilities only by making modifications that are "readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv)-(v). To enter the restaurant, a patron must step down 7 inches to a landing, then turn 90 degrees to the right and step down another 7 inches to the floor. This entrance poses a barrier to access for patrons who use wheelchairs and scooters, but its design makes it difficult to build a ramp.

5. Defendant filed immediately for summary judgment. In addition to noting that the restaurant was owned by "T Corporation" and not by him, Mr. Timberlake noted that installation of a handicap ramp would decimate his business by eliminating a large number of seats. An architect substantiated this claim with an affidavit.

6. Plaintiff opposed summary judgment by arguing that discovery was necessary before a response could be given on the ready achievability of various (still unnamed) modifications.

7. Nine months after filing her complaint, plaintiff filed an expert report which did not rely in any way on defendant's initial disclosures or other discovery materials.

This report noted numerous ways in which Timberlake's did not meet the ADA Accessibility Guidelines (ADAAG). (The ADAAG guidelines were promulgated to govern new construction and new compliance efforts.) Plaintiff at no point identified which of the various asserted instances of non-compliance with the ADAAG stood as barriers to <u>her</u> accessing the goods and services at Timberlake's within the meaning of the ADA, other than the entrance. The report proffered five ways of making the entrance accessible. Defendant replied with a detailed affidavit of the former Chief Building Inspector for the District of Columbia, rebutting the ready achievability of each of the five options.

8. Mr. Timberlake's motion for summary judgment was denied. He again averred that T Corporation was the proper owner of Timberlake's. Leave was granted to amend. Ms. Wasco's amended complaint named the correct defendant, but it still failed to identify which of the instances of non-compliance with the ADAAG stood as barriers to her own access to the goods and services at Timberlake's.

9. The parties went to mediation but failed to reach agreement. A joint expert was then appointed under Rule 706(b). The expert reported that none of the plaintiff's five proffered means of making the entrance accessible was readily achievable, and that many were unsafe. T Corporation moved for summary judgment.

10.  Plaintiff cross-moved for summary judgment, still failing to identify which of the ADAAG violations noted in her expert report stood as barriers to her enjoyment of Timberlake's within the meaning of the ADA.  Plaintiff's position is that summary judgment should be entered on her behalf for some of the small violations named in the expert report, and that, as to the entrance, she still cannot respond to the motion for summary judgment without further discovery into Timberlake's financial resources.

*   *   *   *   *

After reviewing the submissions of the parties I have determined that the defendant's motion for summary judgment is well taken.  There is no genuine issue of material fact as to whether any barrier to this plaintiff's access can be removed by readily achievable means.

## Standing[1]

The plaintiff has not and apparently will not identify which "other current violations" of the ADAAG at Timberlake's are barriers to her enjoyment of the restaurant or cause her any injury in fact.  I must therefore assume that she complains of every enumerated violation of the ADAAG in her expert report, and

---

[1] I am aware of the unseemly irony that a legal doctrine called "standing" is a barrier to Ms. Wasco's access to the courts.  Cf. Adam A. Milani, Wheelchair Users Who Lack "Standing": Another Procedural Threshold Blocking Enforcement of Titles II and III of the ADA, 39 WAKE FOREST L. REV. 69 (2004).

that she believes that each such violation is an instance of discrimination against her within the meaning of the ADA.  Yet plaintiff only has standing to complain of those violations of the ADAAG that restricted or could have restricted her own access to the goods and services at Timberlake's.  Because of her limited investigation and limited pleadings, Ms. Wasco's claims reach no further than the entrance of the restaurant.

The Supreme Court's familiar test for standing requires a plaintiff to show: (1) an injury-in-fact; (2) a causal connection between the activity of which she complains and her injury; and (3) that judicial action could redress her injury.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).  At the summary judgment stage, the plaintiff bears the burden of pointing to record facts that create at least a genuine dispute on these three elements of constitutional standing.  Id. at 561.

Plaintiff has failed to establish her standing to complain of violations in Timberlake's restrooms.  Those restrooms are located down a long, narrow flight of stairs.  Even plaintiff's late-filed expert report concludes that making them accessible to patrons in wheelchairs is not achievable.  Thus, no judicial order can render the Timberlake's restrooms accessible to plaintiff, and the prospect of any injury from non-compliant design elements in the restrooms must be considered wholly

speculative.  <u>See</u> <u>id.</u> at 560 (injury must be actual or imminent, not conjectural or hypothetical).

The ADA does not transform every disabled person into a roving paladin.  It does not permit Ms. Wasco to bring claims on behalf of all disabled persons, for all areas of the restaurant, regardless of who can access them.  Rather, the ADA and the law of standing only empower Ms. Wasco to complain of violations that injure her.  Thus, courts have routinely denied plaintiffs standing to challenge instances of non-compliance with the ADA unrelated to their own disabilities – as plaintiff attempts to do here with the non-brailed signs for the restrooms.  <u>See, e.g.</u>, <u>Steger v. Franco</u>, 228 F.3d 889, 893 (8th Cir. 2000); <u>Martinez v. Longs Drug Stores, Inc.</u>, No. CIV-S-03-1843, 2005 WL 2072013 (E.D. Cal. Aug. 25, 2005).  Courts have sometimes allowed plaintiffs to challenge instances of non-compliance that they did not themselves encounter if such violations were related to their own disabilities, <u>see</u> <u>Steger</u>, 228 F.3d at 893, but no court has found standing in the case of a plaintiff who <u>cannot</u> encounter (and has no right to relief that would allow her to encounter) a design element that could hypothetically constitute a barrier to someone with her disability.  <u>See Martinez</u>, 2005 WL 2072013 at *3 (rejecting the assertion that, "if there is standing to bring a single claim, then the lawsuit, in discovery, becomes an audit of

the entire facility and plaintiff may proceed to trial on all violations identified in the course of the litigation.").

Plaintiff might have had standing to assert a claim about seating – her late-filed expert report states that the tables at Timberlake's do not comply with ADAAG – but she did not make such a claim when she filed her complaint, and she has not to this day specified what it is at Timberlake's, other than the entrance, that causes her an injury-in-fact. The tables may be non-compliant, but plaintiff has not even alleged whether and how those tables injure her, much less shown that injury for purposes of summary judgment. Indeed, it appears from the record that plaintiff believed she could not enter the building because of the steps at the entrance, that her "investigation" ended there, and that she sued before she or her counsel knew what other ADAAG "violations" might exist and whether they were in fact injurious to her.

**Summary Judgment**

Although plaintiff has standing to complain about the entrance to Timberlake's, the record establishes no genuine issue of fact that is material to the dispositive issue in this case: whether the modifications necessary to make the entrance accessible to plaintiff are "readily achievable." The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C.

§ 12181(9).  The detailed report of the jointly-retained expert states that three of the five suggested options for the entrance are "untenable and unsafe" and "give rise to significant public safety concerns," [30, Exhibit A at 3, 5], while the remaining two options are described as "far exceed[ing] the intent of Congress for the readily achievable standard."  Id.  The Supreme Court has indicated that factors other than cost – especially safety and difficulty – are relevant to the determination of ready achievability.  Spector v. Norwegian Cruise Line, 545 U.S. 121, 135 (2005).  Plaintiff had the burden of producing a "readily achievable" plan for removal of architectural barriers, but the plans that she submitted fail to satisfy this burden.  See Gathright-Dietrich v. Atlanta Landmarks, Inc., 452 F.3d 1269 (11th Cir. 2006); Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I, 264 F.3d 999 (10th Cir. 2001).[2]

Option 1 and Option 2 are the simplest ones, but they are not safe.  They involve raising the height of the landing to street level with either a temporary or permanent platform, and

---

[2] Atlanta Landmarks was a summary judgment case; in Colorado Cross there was a trial, but it ended in judgment for the defendant as a matter of law.  In both cases, plaintiffs proffered expert opinions that the barriers could be removed, see Atlanta Landmarks, 452 F.3d at 1274-75; Colorado Cross, 264 F.3d at 1007-08, but both district judges and both appellate panels found those opinions unpersuasive or otherwise insufficient.  An unstated but necessary premise of both decisions is that ready achievability is, essentially, a question for the court.

then using a temporary ramp down to the floor.  The restaurant is narrow, however, and the jointly retained expert notes that the ramps suggested in these options would have slopes more than double the maximum allowed for safety if a "minimally useable" landing of 48 inches were provided (a 60-inch landing is the regulatory minimum).  Such a ramp slope would be "unsafe for all customers," the ramp would cause collateral safety problems, and the temporary ramp would likely be of no use at all during busy periods in the restaurant.  See [30, Exhibit A at 5].  Defendant has submitted an affidavit of the former Chief Building Inspector for the District of Columbia, who notes that "if plans for such a steep portable ramp were presented to the District of Columbia enforcement authorities, such plans would not be approved."  See [8, Exhibit 1]; see also Colorado Cross, 264 F.3d at 1009 (plaintiff must show that city would be likely to approve proposed plan for removal of barrier).  In this case, plaintiff has not only failed to produce evidence that the plans would likely be approved – she has failed to refute evidence that they would be rejected.  These options are therefore inadequate to carry plaintiff's burden on summary judgment.

Options 3 involves raising the height of the landing to street level and then building a platform or "stage" at that height across the full width of the restaurant.  A temporary ramp would then be used to move from that platform to the main floor.

This option is neither safe nor consistent with the building code.  The ramp would occupy the entire width of the primary exit aisle for the restaurant, giving rise to "significant public safety concerns" as well as problems for servers and diners.  <u>See</u> [8, Exhibit 1 at 6-7]; [30, Exhibit A at 5] (jointly-retained expert concurring with the conclusions of former Chief Building Inspector).  The plaintiff has, again, failed to rebut the specific issues identified by both defendant's expert and the joint expert report, and failed to show that the plan would be approved by local building authorities.

Option 5 involves replacing the landing with a motorized lift.  Defendant's architect notes that such a lift may be impossible to build because there is insufficient room for the required gates, and that even if the lift could be fit into the existing space, the area below the lift in the basement currently houses electrical equipment that would have to be moved at tremendous cost.  <u>See</u> [8, Exhibit 3 at 1-2].  There would also be substantial safety issues with making a lift the primary entrance and exit for all patrons – it would certainly be inconsistent with "safety and egress code requirements."  <u>See</u> [30, Exhibit A at 6].  Again, plaintiff offers no specific response on these points.

Option 4 is the only plan with a glimmer of speculative possibility, but plaintiff has not borne the burden of showing

that this plan is readily achievable.  Option 4 involves building the same stage as option 3, but only the stage would be accessible to patrons in wheelchairs.  Defendant's expert has noted that only one accessible table for two patrons could be provided in this space which currently provides seating for six, and plaintiff has again provided no response.[3]  Plaintiff has thus conceded that, in addition to other costs, four seats would be lost if this option were implemented.  But see 28 C.F.R. § 36.304(f) ("The rearrangement of . . . furniture . . . is not readily achievable to the extent that it results in a significant loss of . . . serving space.").

   Plaintiff's Option 4 is expressed as a conceptual design, not with detailed architectural drawings.  Cf. Colorado Cross, 264 F.3d at 1009.  Plaintiff has not responded to the joint expert's caution that the plan would have "significant aesthetic and psychological impact on the ambience of the restaurant."  See [30, Exhibit A at 6].  Plaintiff has submitted cost estimates which are conclusory, Cf. Colorado Cross, 264 F.3d at 1009 (requiring "precise cost estimates"), and differ from those of the joint expert by an order of magnitude.  Compare [30,

---

   [3]   It should be noted that this option provides very limited utility for the disabled – only one table for two is accessible (Ms. Wasco wanted to dine with friends), and that table cannot be reserved for the benefit of disabled patrons under ADAAG 5.4, which allows access to limited areas only when those areas are "usable by the general public and are not restricted to use by people with disabilities."

Exhibit A at 6] with [38, Exhibit B at 8].  Again, plaintiff has said nothing in response to the joint expert's findings on Option 4, and thus apparently concedes that the cost of building the stage area landing alone could exceed $10,000, and might also require raising the ceiling height.  See [30, Exhibit A at 3].  This is not a battle of the experts, because there is only one side battling – despite the passage of three years since defendant filed adverse expert reports and more than nine months since the jointly retained expert presented his adverse findings, plaintiff has failed to introduce any new evidence or analysis tending to rebut those findings.[4]

In short, there is no genuine issue of material fact as to the ready achievability of any of the proffered options.  The only evidence produced by the plaintiff is a conclusory expert report that in no way responds to the detailed structural and engineering findings of either the defendant's expert or the jointly retained expert.[5]  There is no evidentiary basis on which

---

[4]   Plaintiff has recently asked me to stay this case again so that she can depose the jointly retained expert. [43].  This case has been stayed numerous times at plaintiff's request.  Given her failure to carry her burden at this stage, there is no need to withhold judgment any longer.

[5]   Given the summary nature of the findings by plaintiff's expert, and his failure to assess building code and safety requirements in a rigorous way, it is at best unclear whether his conclusions would even be admissible as expert testimony.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) ("The objective of [the Daubert gate-keeping requirement] is to ensure the reliability and relevancy of expert testimony.  It is to make

a reasonable person could reach the conclusion that plaintiff has presented a readily achievable option for making Timberlake's accessible.  See, e.g., Gathright-Dietrich v. Atlanta Landmarks, Inc., 452 F.3d 1269, 1274-75 (11th Cir. 2006) (upholding summary judgment where plaintiff "failed to produce any reliable evidence that those proposals were 'readily achievable,'" and "did not, in any meaningful way, address the engineering and structural concerns associated with their proposals").

An appropriate order accompanies this memorandum.

JAMES ROBERTSON
United States District Judge

---

certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").